AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

SHAKEEMA POOLER

)
)
)
)
)

_____
*Plaintiff(s)*

THE CITY OF NEW YORK, a municipal entity,
POLICE OFFICER JANIELLE MENDOZA, POLICE
OFFICERS "JOHN DOES 1-3," POLICE
DEPARTMENT SUPERVISING OFFICERS "JOHN
DOES 1-3".

)
)
)

*Defendant(s)*

Civil Action No. **12 CIV 5208**

*JUDGE SCHEINDLIN*

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   The City of New York, Police Officers "John Does 1-3," Police Department Supervising
Officers "John Does 1-3"
C/O Corporation Counsel of New York
100 Church Street
New York, New York 10007

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

DAVID THOMPSON
Stecklow Cohen & Thompson
10 Spring Street Suite 1
New York, New York 10012
(212) 566-8000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

*CLERK OF COURT*

Date: ___JUL 0 3 2012___

_____
*Signature of Clerk or Deputy Clerk*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SHAKEEMA POOLER,

: INDEX NO. *JUDGE SCHEINDLIN*
: ECF CASE

Plaintiff,

: JURY TRIAL DEMANDED

- against -

THE CITY OF NEW YORK, a municipal entity,
POLICE OFFICER JANIELLE MENDOZA,
POLICE OFFICERS "JOHN DOES 1-3,"
POLICE DEPARTMENT SUPERVISING
OFFICERS "JOHN DOES 1-3",

**12 CIV 5208**
COMPLAINT



Defendants.

-----------------------------------------------------------------X

Plaintiff  Shakeema  Pooler,  by  her  attorney,  DAVID  A.  THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I.    PRELIMINARY STATEMENT

1.    Plaintiff Shakeema Pooler brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of her civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.    On or about May 23, 2011, plaintiff Shakeema Pooler was walking home from work with two co-workers.   Shakeema Pooler was an employee of the Harlem Children's Zone/Promise Academy and the Future Leadership Charter School.

Shakeema Pooler's companions on that day were also employees of the Harlem Children's Zone. Each were wearing t-shirts identifying them as school employees.

3. As the three young women crossed 128th Street, the light changed and a police car accelerated, nearly hitting one of Shakeema Pooler's co-workers (hereafter, "Ms. J"). Ms. J waved her arm at the car. The three three continued walking. Suddenly, the police car ran up onto the sidewalk and two officers jumped out. The first officer, Defendant Police Officer Janielle Mendoza, grabbed Ms. J, dragged her over near a window, and demanded to see her identification.

4. Shakeema Pooler asked Defendant Police Officer John Doe 1 why his partner was arresting Ms. J. Defendant Police Officer John Doe 1 answered that his partner was having a bad day. As Defendant Police Officer Mendoza was placing Ms. J into the back of the police car, two other officers arrived and asked Shakeema Pooler what was happening. When she tried to answer, Defendant Police Officer Mendoza yelled at her to be quiet. Defendant Police Officer Mendoza then approached Shakeema Pooler and attempted to place her in handcuffs. He did so without moving Shakeema Pooler's shoulder bag out of the way. The bag straps became caught and twisted, causing Shakeema Pooler pain. Defendant Police Officer Mendoza grabbed and twisted her arm.

5. While Shakeema Pooler was being moved into the car, Ms. Pooler told Defendant Police Officer Mendoza that he was arresting just meet his quota. Defendant Police Officer Mendoza and Defendant Police Officer John Doe 1 then got into the car, drove it around a corner, and stopped to discuss what to do. Defendant Police Officer Mendoza told Defendant Police Officer John Doe 1, in sum and substance, "Don't turn

2

against me." They then drove to the 32nd Precinct, where Ms. Pooler and Ms. J were searched, then held for several hours until after dark. Eventually, Ms. Pooler was taken to 100 Centre Street, where she was held until 1:00 PM the following day. She was charged with disorderly conduct and resisting arrest. Because of her arrest, Ms. Pooler was fired from her job.

## II.    JURISDICTION

6.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

7.      Plaintiff Shakeema Pooler further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III.   VENUE

8.      Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV.   JURY DEMAND

9.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

3

## V.    THE PARTIES

10.    The Plaintiff SHAKEEMA POOLER is an American citizen and is currently a resident of Manhattan, New York.

11.    At all times relevant to this action, Plaintiff was an American citizen and a resident of the City of New York, County of New York and State of New York.

12.    Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

13.    Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, THE CITY OF NEW YORK.

14.    At all times, the Defendant New York City Police Officers Police Officer JANIELLE MENDOZA and Police Officers JOHN DOES 1-3 (collectively, the "ARRESTING OFFICERS"), were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.  Plaintiff asserts her claims against each in both their official and individual capacities.

15.    At all times, the POLICE DEPARTMENT SUPERVISING OFFICERS "JOHN DOES 1-3" (the "SUPERVISING OFFICERS"; collectively with the ARRESTING OFFICERS, "Defendant POLICE OFFICERS") were duly sworn police officers of said department and were acting under the supervision of said department and

4

according to their official duties. Plaintiff asserts her claims against each in both their official and individual capacities.

16.    At all times relevant to this action, all of the Defendant POLICE OFFICERS, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

17.    Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope of their employment by defendant THE CITY OF NEW YORK.

18.    Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.

## VI.    FACTS COMMON TO ALL CLAIMS

19.    On or about May 23, 2011, around 6:15 pm Plaintiff SHAKEEMA POOLER, along with her co-workers "Ms. J" and "Ms. K", were walking north on Lenox Ave, near 128th Street, after leaving work.

20.    On 128th Street, an NYPD car was sitting at a red light.

21.    Plaintiff and her two co-workers crossed 128th Street.

22.    As they were finishing crossing, the light changed and the police car accelerated, nearly hitting Ms. J.

23.    Ms. J. raised her hand towards the police car, and the three continued walking north.

5

9

24.     As Plaintiff, Ms. J and Ms. K approached 129th Street, the same police car ran up onto the sidewalk.

25.     POLICE OFFICER MENDOZA jumped out of the car, grabbed Ms. J, pulled her over to a window of the nearby laundromat, and demanded to see her identification.

26.     POLICE OFFICER JOHN DOE 1 also got out of the police car.

27.     SHAKEEMA POOLER explained to POLICE OFFICER JOHN DOE 1 that she and her companions were merely headed home after work.

28.     Plaintiff showed POLICE OFFICER JOHN DOE 1 that Plaintiff and her two companions were each wearing t-shirts identifying them as employees of Harlem Children's Zone.

29.     Plaintiff then asked POLICE OFFICER JOHN DOE 1 why Ms. J was being questioned and arrested.

30.     POLICE OFFICER JOHN DOE 1 answered, in sum and substance, "I, don't know, my partner must be having a bad day. Just let him search you."

31.     POLICE OFFICER MENDOZA put handcuffs on Ms. J and put her in the back seat of the police car.

32.     Two other police officers, POLICE OFFICER JOHN DOES 2-3, arrived and asked Plaintiff what was happening.

33.     POLICE OFFICER MENDOZA saw Plaintiff talking to POLICE OFFICER JOHN DOES 1-3, and yelled at her, in sum and substance, "You want to get involved with this, too? You need to be quiet!"

34.    SHAKEEMA POOLER answered, in sum and substance, "What are you talking about? We just got out of work."

35.    Defendant POLICE OFFICER MENDOZA then approached Plaintiff and attempted to place her in handcuffs.

36.    He did so without moving Plaintiff's shoulder bag out of the way.

37.    The bag straps became caught and twisted, causing Plaintiff pain.

38.    Defendant POLICE OFFICER MENDOZA grabbed and twisted her arm.

39.    After she was handcuffed, SHAKEEMA POOLER said, in sum and substance, "You're just doing this to get your numbers up."

40.    POLICE OFFICER MENDOZA then put Plaintifff in the back seat of the car next to Ms. J.

41.    POLICE OFFICER MENDOZA and POLICE OFFICER JOHN DOE 1 then drove the police car around a corner and parked it again.

42.    While parked, POLICE OFFICER MENDOZA and POLICE OFFICER JOHN DOE 1 discussed what charges to bring against Plaintiff and Ms. J.

43.    POLICE OFFICER JOHN DOE 1 asked, in sum and substance, "Yo, Bro, what are we gonna do?"

44.    POLICE OFFICER MENDOZA answered, in sum and substance, "Don't turn against me."

45.    POLICE OFFICER MENDOZA and POLICE OFFICER JOHN DOE 1 then drove the police car to the 32nd precinct.

46.    POLICE OFFICER MENDOZA and POLICE OFFICER JOHN DOE 1 got out of the police car and had another brief conversation.

7

47.    POLICE OFFICER MENDOZA said, in sum and substance, "Don't fucking betray me.  You're supposed to be my partner."

48.    They then took Plaintiff and Ms. J out of the car and brought them into the precinct.

49.    Inside the precinct, a pair of female officers searched them in front of multiple other officers, patted down their breasts, searched their bags, and found nothing.

50.    After the search, Plaintiff and Ms. J were put in a holding cell.

51.    They were held in the cell until after it was dark.

52.    Later that night, Plaintiff was taken to 100 Centre Street for arraignment.

53.    Plaintiff was held at 100 Centre Street until about 1:00 PM the following day.

54.    POLICE OFFICER MENDOZA swore out a criminal complaint against Plaintiff.

55.    POLICE OFFICER MENDOZA falsely stated that Plaintiff attempted to prevent a police officer from making an arrest.

56.    POLICE OFFICER MENDOZA falsely stated that Plaintiff engaged in fighting.

57.    POLICE OFFICER MENDOZA falsely stated that Plaintiff cause a crowd to gather.

58.    POLICE OFFICER MENDOZA falsely stated that Plaintiff resisted arrest.

59.    POLICE OFFICER MENDOZA falsely stated that Plaintiff yelled and screamed at Officer Mendoza.

60.    In fact, at no point did Plaintiff fail to comply with any lawful order given by Defendant POLICE OFFICERS present, or in any other way perform an unlawful act.

61.    Plaintiff was required to return to court numerous times to dispute these baseless charges.

62.    Plaintiff's employer was alerted that she had been fingerprinted incident to an arrest.

63.    Plaintiff's employer fired her after finding out that she had been arrested.

64.    On December 12, 2011, the charges were dismissed.

65.    As a result of the conduct described above, SHAKEEMA POOLER suffered pain, fear and humiliation.

66.    Upon information and belief, the Defendant POLICE OFFICERS present at the arrest of SHAKEEMA POOLER knew at the time they arrested Plaintiff that they lacked probable cause to arrest Plaintiff for any crime.

67.    Upon information and belief, the Defendant POLICE OFFICERS present at the arrest of SHAKEEMA POOLER arrested the SHAKEEMA POOLER, at least in part, to meet their prescribed quantitative productivity goals for arrests.

68.    During all of the foregoing wrongful acts committed against Plaintiff SHAKEEMA POOLER, while Defendant POLICE OFFICER MENDOZA was present, Defendant POLICE OFFICERS (John Does 1-3) did not intervene on behalf of Plaintiff SHAKEEMA POOLER, despite having a realistic opportunity to do so.

69.    As a result of the above actions by Defendant POLICE OFFICERS, SHAKEEMA POOLER lost her job.

9

70.    As a result of the above actions by Defendant POLICE OFFICERS, SHAKEEMA POOLER suffered emotional and mental trauma.

71.    As a result of the foregoing, SHAKEEMA POOLER sustained, *inter alia*, physical pain, mental injuries, emotional distress, embarrassment, humiliation and deprivation of her constitutional rights.

## THE NYPD ARRESTS INNOCENT BYSTANDERS TO POLICE ACTIVITY IN VIOLATION OF THE CONSENT DECREE IN BLACK V. CODD

72.    On June 1, 1977, Defendant City of New York entered into a consent decree with the Plaintiff in **Black et al. v. Codd et al.**, United States District Court, Southern District of New York, 73 Civ. 5283 ("Consent Decree").

73.    This Consent Decree was incorporated into the New York Police Department Patrol Guide in 1990, setting forth the New York Police Department's recognition of this Consent Decree and explicit adoption of a policy of recognizing the rights of onlookers to police actions to remain in the area of police actions in progress and to ask police officers questions, explicitly including but not limited to requesting the names and badge numbers of police officers.

74.    The Consent Decree states that no person shall be subject to arrest for remaining in the vicinity of a stop or arrest unless probable cause exists to believe that the person is in violation of Penal Law § 195.05, Obstructing governmental administration in the second degree.

75.    Penal Law § 195.05 provides:

A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or

10

interference, or by means of any independently unlawful act, or by means of interfering, whether or not physical force is involved, with radio, telephone, television or other telecommunications systems owned or operated by the state, or a county, city, town, village, fire district or emergency medical service or by means of releasing a dangerous animal under circumstances evincing the actor's intent that the animal obstruct governmental administration.

76.     Obstructing governmental administration in the second degree requires obstruction by "intimidation, physical force or interference, or by means of any independently unlawful act."

77.     The Consent Decree in <u>Codd v. Black</u> states at 2 that: "[n]one of the following constitutes probable cause for the arrest or detention of an onlooker [to a police action] unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated: …. (a) Speech alone, even though crude or vulgar. … (d) Remaining in the vicinity of a stop or arrest."

78.     Upon information and belief, the Consent Decree remains in effect, and the City of New York and members of the New York City Police Department are legally bound to comply with the Consent Decree.

79.     Nevertheless, NYPD officers maintain a pattern and practice of arresting bystanders to police activity, in violation of the Consent Decree.

80.     Perhaps hundreds of people lawfully observing police activity were arrested for doing so during the Occupy Wall Street protests.

81.     Even in far more routine situations, people attempting to observe or speak to police in the vicinity of an arrest are frequent targets for arrest themselves:

82.     In July 2008, police stopped and arrested a man in the Lower East Side area of Manhattan. As reported in the New York Post of July 30, 2008, after two officers

11

placed the arrestee on the ground, one of the officers began beating him with his nightstick. Two bystanders captured the beating on video. The two men who filmed the beating were arrested and charged with disorderly conduct.[1]

83.    As reported in the New York Daily News on June 16, 2010, Queens councilman Dan Halloran was given a ticket for blocking a crosswalk when he stopped to take pictures of a New York City Police Department vehicle that Mr. Halloran had observed driving recklessly and violating traffic laws on its way to a Dunkin' Donuts.[2]

84.    As reported by NBC New York television news on July 22, 2010, two officers who were videotaped beating a defenseless arrestee, Walter Harvin, arrested Mr. Harvin and charged him with resisting arrest and disorderly conduct in order to justify their attack upon him. One of the officers involved was criminally charged as a result.[3]

85.    As reported by Brooklyn City Councilman in July 2007, two bystanders observing a young man who was handcuffed and immobilized being beaten by police officers, were themselves beaten and arrested when they asked the officers to stop beating

---

[1]    Alpert, Lukas I., and Weiss, Murray, "2nd Video Gives NYPD Black Eye." New York Post, July 29, 2008. Article incorporated by reference herein and available online at http://www.nypost.com/p/news/regional/item_EZ7SbCpNNtsxar3MnXJ5JM.

[2]    Trapasso, Clare, "Queens councilman Dan Halloran irate over light-running, yakking traffic cop Daniel Chu," New York Daily News, June 16, 2010. Article incorporated by reference herein and available online at http://articles.nydailynews.com/2010-06-16/local/27067286_1_traffic-cop-councilman-ticket.

[3]    Scharr, Jillian, "Video Released in Police Brutality Case," NBC New York, June 22, 2010. incorporated by reference herein and available online at a http://www.nbcnewyork.com/news/local/Video-Released-in-Police-Brutality-Case-96882129.html.

the defenseless arrestee.  One of the bystanders was charged with obstruction of justice, resisting arrest and disorderly conduct.[4]

## THE NYPD COMPELS ITS OFFICERS TO MEET UNLAWFUL ARREST QUOTAS, COMPELLING THOUSANDS OF BASELESS AND UNLAWFUL ARRESTS

86.    The NYPD places emphasis on numbers-driven street-level enforcement of minor violations such as marijuana offenses.[5]

87.    Indeed, the use of an explicit quota system has been documented at the several precincts.[6]

88.    This quota system is enforced by the very top levels of the NYPD through the Department's Compstat system.

89.    In a full-page ad on page 15 of the May 7, 2012 edition of the New York Daily News, The Patrolmen's Benevolent Association made clear that the quota pressure comes from the top.   Referring to these quotas, the ad is headlined: "Don't Blame the Cop, Blame NYPD Management."

90.    The NYPD uses Compstat to track such enforcement actions statistically.

--------

[4]    Shabazz, Saeed "Activist lawyers beaten by Brooklyn police," FinalCall.com News, July 12, 2007.  Article incorporated by reference herein and available online at http://www.finalcall.com/artman/publish/article_3711.shtml.
[5]    Defendants' [City of New York et al.] Local Civil Rule 56.1 Statement of Undisputed Facts, 08 CIV.  01034 (SAS) [SDNY], docket number 144, filed 2/24/2011, paragraphs 116-131.
[6]    Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://articles.nydailynews.com/2010-11-08/local/27080554_1_memos-quotas-seat-belt.

13

91.     The NYPD holds weekly crime strategy meetings, "Compstat Meetings," at which such reports are discussed.[7]

92.     Compstat Meetings are attended by all commanders of Precincts, Police Service Areas, Transit Districts and other operational unit commanders within a given Patrol Borough, including the commanding officers and /or supervisors of precinct-based and specialized investigative units.[8]

93.     Also in attendance are representatives from the District Attorneys' Offices as well as Transit and Housing Bureau Commanders whose jurisdictions lie within the patrol borough, Crime Strategy Coordinators from other patrol boroughs, and ranking officers from a variety of support and ancillary units (such as the Legal Bureau which do not perform direct enforcement functions.).[9]

94.     The purpose of these Compstat Meetings is for the commanders to direct and modify street-level law enforcement policy based on Compstat statistics.[10]

95.     At these weekly Compstat Meetings, commanders either ratify that the statistics show that the NYPD's street-level activities are correctly implementing the NYPD's stated policies, or street-level deployments are modified to bring these activities in line with such policies.[11]

--------------------------

[7]     Id.
[8]     Id.
[9]     Id.
[10]    Id.
[11]    Id.

14

96.     In this way, the highest-level command of the NYPD exercises granular control over summonses and arrests for minor violations and quality of life offenses, as well as for stop, question and frisk activity.[12]

97.     What street-level police officers do is a direct result of these command-level policies.

98.     As the New York Daily News reported, NYPD supervisors give explicit instructions to street-level enforcement personnel that quantity, not quality, matters – promulgating a policy that comes from the very top of the NYPD hierarchy.  [13]

99.     Individual officers have stepped forward to denounce the NYPD's use of quotas, which are illegal.[14]

100.    Officers that refuse to meet illegal quotas are subject to adverse employment actions and other retribution from their superiors.[15]

101.    The NYPD officially denies that it maintains and enforces quotas.

_____

[12]     Id.

[13]     Parascandola, Rocco, "Cops On Tape Pushing Arrest Quotas: NYPD Lt.  Janice Williams captured on tape pushing for more busts, but brass says there's no quotas," The New York Daily News, March 3, 2011.

[14]     Parascandola, Rocco, "Cops On Tape Pushing Arrest Quotas: NYPD Lt.  Janice Williams captured on tape pushing for more busts, but brass says there's no quotas," The New York Daily News, March 3, 2011; Parascandola , Rocco, "An ex-Bronx cop Ex-Cop Sues City, Says Quotas Led to Firing: Ex-Bronx cop Vanessa Hicks suing city, says quotas led to axing," The New York Daily News, May 2, 2011; Parascandola, Rocco, "79th Precinct cops claim retribution: Nine officers say poor evaluations are payback from commander," The New York Daily News, April 10, 2012.

[15]     See id.

15

102.    However, the existence of this unconstitutional arrest quota custom and/or policy has been shown by the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn.[16]

103.    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by WABC-TV/DT, in which a 41st precinct sergeant explains that each of his officers is held to a twenty summons per month, and one arrest per month, enforcement quota.[17]

104.    The existence of the aforesaid unconstitutional arrest quota custom and policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make quota-driven arrests as directed by their superiors even if they must void the arrests at the end of their shifts.[18]

## THE NYPD TOLERATES AND CONDONES WIDESPREAD PERJURY BY ITS OFFICERS

105.    NYPD policy rewards arrests that are based on false statements in criminal complaints sworn by NYPD officers.

---

[16]    Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://articles.nydailynews.com/2010-11-08/local/27080554_1_memos-quotas-seat-belt.

[17]    Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

[18]    Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town." Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

16

106.    As United States District Court Judge Jack Weinstein wrote: "Informal inquiry by [myself] and among the judges of this court, as well as knowledge of cases in other federal and state courts ... has revealed anecdotal evidence of repeated, widespread falsification by arresting officers of the New York City Police Department."[19]

107.    By its nature, the true extent of police perjury has not been documented. The Mollen Commission in the 1990's found that police perjury was so pervasive that the police even had a word for it: "testilying."[20]

108.    Police perjury often involves lying about matters that are outcome determinative in litigation, and that go to the heart of a defendant's guilt or innocence.[21]

109.    Certain types of arrests occur with such frequency that the pattern and practice of police perjury has been at least partially exposed.

110.    In 2008, the New York Times documented at least 20 cases in federal court in which police provided false boilerplate testimony to justify searches and seizures of guns.  These cases represented only that small fraction of cases in which the boilerplate testimony could be challenged with more than the word of the defendant.[22]

111.    Another category of arrest where police perjury has been documented is misdemeanor marijuana arrests.  Where an officer encounters a person in possession of a

---

[19]    Marzulli, John, "Judge Jack Weinstein rips NYPD on false arrests as brothers sue for $10M over wrongful narcs bust," The New York Daily News, Nov.  30, 2009.
[20]    Cunningham, Larry, "Taking on Testilying: The Prosecutor's Response to In-Court Police Deception," *Criminal Justice Ethics* Winter/Spring 2009.
[21]    Id.
[22]    Weiser, Benjamin, "Police in Gun Searches Face Disbelief in Court," May 12, 2008.

small amount of marijuana, the officer can convert the arrest offense from a violation to a misdemeanor simply by testifying that the marijuana was in "plain view."

112.    Each year the NYPD makes thousands of arrests for the possession of marijuana "in plain view." The overwhelming publicly available evidence shows that in the majority of these arrests, the marijuana was not in plain view when the person was arrested, and the basis of the charge was police perjury.[23]

113.    The NYPD has taken no steps to disincentivize – much less punish – the practice of perjury that underlies these arrests. Indeed, the number of such arrests continues to increase.[24]

114.    Nor has the NYPD taken any steps to punish police perjury in other contexts.

115.    There is a nexus between arrest quotas and the NYPD's toleration of police perjury: <u>police under pressure to make their quota of arrests make false arrests based on perjured accusations in order to do so</u>.[25]

---

[23]    Levine, Harry G. and Deborah Peterson Small, Marijuana Arrest Crusade: Racial Bias and Police Policy in New York City 1997-2007, New York Civil Liberties Union, April 2008, p. 5.

[24]    Parascandola, Rocco and Sarah Armaghan, "Arrests for low-level pot possession higher in 2011 than 2010, despite NYPD directive restricting busts Marijuana arrests near an all-time high," The New York Daily News, February 2, 2012; Beekman, Daniel, Study claims NYPD made hundreds of unlawful pot arrests," The New York Daily News, April 03, 2012.

[25]    Marzulli, John, "We fabricated drug charges against innocent people to meet arrest quotas, former detective testifies," The New York Daily News, October 13th 2011.

18

## THE NYPD HAS A POLICY AND PRACTICE OF TOLERATING AND CONDONING POLICE MISCONDUCT

116.    When the Civilian Complaint Review Board substantiates claims of police misconduct, The NYPD usually does **not** follow the board's recommendations that officers guilty of misconduct be given the most serious penalty.  From 2002 to 2010, he said, the board recommended that 2,078 officers receive the most severe penalty.  That suggested discipline was given to only 151 officers.[26]  Thus, the Department has set a policy that the consequences of misconduct will be mild or nonexistent.

117.    This pattern of toleration of violent police misconduct by the NYPD is a policy and practice of long standing: in 2007, the New York Civil Liberties Union found that the NYPD's practice if "condoning" police misconduct actually got worse over the period of time studied (1994-2006).   The NYCLU researchers found:

♦    Of the more egregious cases of misconduct that have been substantiated by the CCRB and referred to the NYPD for disciplinary action between 2000 and 2004 – the last year for which complete data [were then] available on disciplinary action – the police commissioner has rejected the CCRB's findings in 63 percent of those cases.  When discipline was imposed, it was strikingly lenient in light of the severity of the misconduct that has been documented by the CCRB.[27]

---

[26]    Baker, Al, "Independent Agency Gets New Powers to Prosecute New York Police Officers," March 27, 2012.
[27]    Mission Failure: Civilian Review of Policing in New York City (1994-2006), The New York Civil Liberties Union, September 2007.

118.    Similar indifference to substantiated allegations of police misconduct was documented in a 1998 report by the Human Rights Watch.[28]

### THE NYPD UNLAWFULLY CHARGES INNOCENT PEOPLE WITH "COVER," CHARGES TO PUNISH "CONTEMPT OF COP"

119.    Upon information and belief, police officers in the City of New York make arrests in the absence of the commission of any crime by the person arrested, motivated by a desire to punish the arrestee for the arrestee's perceived failure to display the degree of deference or subservience demanded by the arresting officers.

120.    Such arrests are frequently referred to as "contempt of cop" arrests.

121.    In order to conceal the illegality of these arrests, the victim of the unlawful arrest is charged with a "cover charge," usually a low-level crime which does not require a complainant, and whose elements can be established, for the purposes of a criminal complaint, by the officer's own perjured affidavit or testimony.

122.    NYPD police officers have a pattern and practice of charging one or more of a trinity of offenses as their favored cover charges: disorderly conduct, resisting arrest, and obstruction of governmental administration.

123.    However, other charges that require no complainant, such as quality of life infractions like open container or excessive noise violations, are also used to cover false arrests.

_____

[28] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998.  Report incorporated by reference herein and available online at http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspo/html/toc.htm.

20

124.    The New York Times published a special report on the incidence of police brutality as a response to perceived "contempt of cop" by residents of the City of New York, and documented officers' use of cover charges in such cases.[29]

125.    The NYPD has never undertaken any internal study of contempt of cop arrests or cover charges, and statistics on these practices are not available. However, there is extensive evidence of a widespread practice of false cover charges.

126.    In a case profiled by the CCRB, that board substantiated a quintessential contempt-of-cop/cover charge false arrest: "The board also determined that the second officer improperly drew his gun, failed to provide his name as required by the department's Patrol Guide, and lacked probable cause to issue the disorderly conduct summons, a summons motivated by the man's challenging the officers' actions."[30]

127.    In another such case, the CCRB found that a detective struck a man in the back of the head with a gun when the man questioned the detective. The man was charged with disorderly conduct, which charges were dismissed.[31]

128.    In another such case, the CCRB found that without legal justification an officer arrested a man who accidentally bumped into him on the street. The CCRB found that the officer issued the man a summons charging him with disorderly conduct, and the

---

[29]    Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report: Disrespect as Catalyst for Brutality," New York Times, November 19, 1997. Article incorporated by reference herein and available online at http://www.nytimes.com/1997/11/19/nyregion/challenge-to-authority-a-special-report-disrespect-as-catalyst-for-brutality.html?pagewanted=all.
[30]    CCRB Case Profiles, available at http://www.nyc.gov/html/ccrb/html/profiles.html (last visited May 15, 2012).
[31]    Id.

21

officer told him, "You're lucky I didn't beat the shit out of you." A court dismissed the disorderly conduct summons.[32]

129.    Indeed, many arrests in violation of the Consent Decree in <u>Black v. Codd</u> are also Contempt of cop arrests where "cover charges" are the only charges filed.

130.    Defendant City of New York and the New York Police Department continue to resist calls for disclosure statistics concerning minor crimes such as the typical "cover charge" crimes.[33]

131.    The NYPD's failure to respond to this well documented problem, and its obstruction of efforts of outside parties to document and address this issue, amount to ratification of the pattern and practice of contempt of cop arrests and excessive force, justified by false cover charges, by the NYPD's agents, employees, and officers.

## FEDERAL CLAIMS

### FIRST CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS
### UNDER 42 U.S.C. § 1983

132.    DEFENDANT THE CITY OF NEW YORK and DEFENDANT POLICE OFFICERS (collectively, "ALL DEFENDANTS") deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth,

---

[32]    <u>Id.</u>

[33]    Rivera, Ray and Baker, Al, "Data Elusive on Low-Level Crime in New York City," The New York Times, Nov. 1, 2010. Article incorporated by reference herein and available online at http://www.nytimes.com/2010/11/02/nyregion/02secrecy.html?pagewanted=all.

Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

133.    The Defendant POLICE OFFICERS acted in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

134.    Defendant THE CITY OF NEW YORK and the New York City Police Department are responsible for the actions of their employees under the doctrine of *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978), and/or the doctrine of respondeat superior.

135.    As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer damages, injuries or harm.

136.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS UNDER 42 U.S.C. §1983 ARISING FROM WARRANTLESS ARREST WITHOUT PROBABLE CAUSE

137.    Defendant ARRESTING OFFICERS arrested Plaintiff without a warrant.

138.    Defendant ARRESTING OFFICERS arrested Plaintiff without having probable cause to do so.

139.    Defendant ARRESTING OFFICERS arrested Plaintiff in violation of the Consent Decree in **Black v. Codd**, because Plaintiff was arrested merely for being in the vicinity of the ARRESTING OFFICERS' stop of Ms. J.

140.    Plaintiff was arrested merely for speaking to the ARRESTING OFFICERS' stop of Ms. J.

141.    Furthermore, no probable cause existed to believe that Plaintiff is in violation of Penal Law § 195.05, because Plaintiff did not use "intimidation, physical force or interference, or [commit] any independently unlawful act."

142.    Indeed, Plaintiff was not charged with violation of Penal Law § 195.05.

143.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

THIRD CLAIM FOR RELIEF
VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS
UNDER 42 U.S.C. §1983
ARISING FROM DEFENDANTS' MALICIOUS PROSECUTION OF PLAINTIFF

144.    Defendant POLICE OFFICER MENDOZA instituted criminal proceedings against the Plaintiff.

145.    These prosecution ended in the Plaintiff's favor.

146.    There was no probable cause to initiate these prosecutions.

147.    Defendant POLICE OFFICER MENDOZA acted maliciously in initiating the proceedings.

148.    Plaintiff was deprived of their liberty as a result.

149.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

24

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF PLAINTIFFS' FOURTH AMENDMENT RIGHTS
### UNDER 42 U.S.C. §1983
### ARISING FROM DEFENDANTS' USE OF EXCESSIVE FORCE

150.    Defendant POLICE OFFICER MENDOZA and the other Defendant ARRESTING OFFICERS placed Plaintiff in handcuffs.

151.    Defendant POLICE OFFICER MENDOZA and the other Defendant ARRESTING OFFICERS did so using unnecessary force.

152.    Defendant POLICE OFFICER MENDOZA and the other Defendant ARRESTING OFFICERS twisted and injured Plaintiff's arms.

153.    The handcuffs were too tight, and were left on for an unreasonable period of time.

154.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF PLAINTIFFS' FOURTH AMENDMENT RIGHTS
### UNDER 42 U.S.C. §1983
### ARISING FROM DEFENDANTS' FABRICATION OF EVIDENCE AND
### PERJURY

155.    Defendant POLICE OFFICER MENDOZA made false statements, including false sworn criminal complaints, alleging that the Plaintiff committed illegal acts.

156.    Defendant POLICE OFFICER MENDOZA fabricated evidence to support these false claims.

25

157.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. §1983 ARISING FROM DEFENDANTS' FAILURE TO INTERVENE

158.    Defendant POLICE OFFICERS and Defendant CITY OF NEW YORK had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other Defendant POLICE OFFICERS.

159.    Defendant POLICE OFFICERS and Defendant CITY OF NEW YORK failed to intervene on Plaintiff's behalf despite having had a realistic opportunity to do so.

160.    Defendant POLICE OFFICERS and Defendant CITY OF NEW YORK failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which the plaintiff's rights were violated by their affirmative conduct.

161.    As a result of the aforementioned conduct of the individual defendant, Plaintiff's constitutional rights were violated.

162.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### FAILURE TO TRAIN SUBORDINATES AGAINST SUPERVISING OFFICERS JOHN DOES 1-3

163.    SUPERVISING OFFICERS JOHN DOES 1-3 were those officers, whose names are presently unknown, who by virtue of their position or assignment had authority to supervise the ARRESTING OFFICERS.

26

164.    SUPERVISING OFFICERS JOHN DOES 1-3 were imbued with direct supervision and control over the ARRESTING OFFICERS in the performance of their duties.

165.    SUPERVISING OFFICERS JOHN DOES 1-3 were imbued with authority to train and discipline the ARRESTING OFFICERS.

166.    SUPERVISING OFFICERS JOHN DOES 1-3 knew or should have known that the ARRESTING OFFICERS had a propensity to violate the constitutional rights of people with whom these ARRESTING OFFICERS came into contact.

167.    SUPERVISING OFFICERS JOHN DOES 1-3 knew or should have known that ARRESTING OFFICERS needed training in how to refrain from further such misconduct.

168.    SUPERVISING OFFICERS JOHN DOES 1-3 were deliberately indifferent to ARRESTING OFFICERS's need for such training.

169.    As a result of the aforementioned failure to train, Plaintiff's constitutional rights were violated.

170.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

## FAILURE TO SUPERVISE SUBORDINATES AGAINST SUPERVISING OFFICERS JOHN DOES 1-3

171.    SUPERVISING OFFICERS JOHN DOES 1-3 were those officers, whose names are presently unknown, who by virtue of their position or assignment had authority to supervise the ARRESTING OFFICERS.

172.    SUPERVISING OFFICERS JOHN DOES 1-3 were imbued with direct supervision and control over the ARRESTING OFFICERS in the performance of their duties.

173.    The ARRESTING OFFICERS reported to SUPERVISING OFFICERS JOHN DOES 1-3.

174.    SUPERVISING OFFICERS JOHN DOES 1-3 knew or should have known that the ARRESTING OFFICERS had a propensity of violating the constitutional rights of people with whom these officers came into contact.

175.    SUPERVISING OFFICERS JOHN DOES 1-3 knew or should have known that the ARRESTING OFFICERS needed supervision to prevent them from committing further such misconduct.

176.    SUPERVISING OFFICERS JOHN DOES 1-3 failed to effectively discipline the ARRESTING OFFICERS for their misconduct.

177.    SUPERVISING OFFICERS JOHN DOES 1-3 failed to correct the ARRESTING OFFICERS for their unconstitutional policing practices.

178.    As a result of the aforementioned failure to supervise, Plaintiff's constitutional rights were violated.

179.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

<u>NINTH CLAIM FOR RELIEF</u>

<u>MUNICIPAL LIABILITY UNDER *MONELL*
UNDER 42 U.S.C. §1983
ARISING FROM UNCONSTITUTIONAL MUNICIPAL POLICIES AND
CUSTOMS</u>

28

180.    Defendant THE CITY OF NEW YORK and the NYPD established official policies directing and promoting unconstitutional practices by NYPD officers, and have tolerated, condoned and permitted widespread unconstitutional practices by NYPD officers.

181.    Defendant THE CITY OF NEW YORK indemnifies and shields NYPD officers who repeatedly and habitually violate constitutional rights, such as Defendant POLICE OFFICERS.

182.    Defendant THE CITY OF NEW YORK fails to discipline police misconduct, thereby insuring that such misconduct continues.

183.    Defendant THE CITY OF NEW YORK implements quotas for individual officers' arrests, thus incentivizing or compelling unconstitutional misconduct by individual officers.

184.    Defendant THE CITY OF NEW YORK tolerates and condones police perjury.

185.    Defendant THE CITY OF NEW YORK implements, tolerates, and fails to punish unlawful, warrantless arrests in violation of the Consent Decree in <u>Black v. Codd</u>.

186.    Defendant THE CITY OF NEW YORK tolerates and condones the unlawful practice of cover charge arrests for contempt of cop.

187.    These policies and practices caused the unlawful conduct of the ARRESTING DEFENDANTS.

188.    As a result of the aforementioned customs, patterns and practices, Plaintiff's constitutional rights were violated.

29

189.   As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF

## PUNITIVE DAMAGES AGAINST DEFENDANT POLICE OFFICERS

190.   The actions of the Defendant POLICE OFFICERS constituted intentional violations of federal law.

191.   The actions of the Defendant POLICE OFFICERS were motivated by evil motive or intent, or involved involves reckless or callous indifference to the federally protected rights of the Plaintiff.

192.   As a result, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Empanel a jury.

[d] Award attorney's fees and costs.

[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:    New York, New York
          July 3, 2012

Respectfully submitted,

DAVID A. THOMPSON
STECKLOW COHEN & THOMPSON, PLLC
10 SPRING STREET – SUITE 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
DTHOMPSON@WYLIELAW.COM
ATTORNEY FOR PLAINTIFF

31